*In re* AGUSTÍN R. HERNÁNDEZ ENRÍQUEZ, querellado.

*Número:* O-82-134    *Resuelto:* 1 de junio de 1984

*Justo Gorbea Varona, Procurador General Interino,* y *Lourdes del C. Rodríguez, Procuradora General Auxiliar,* abogados de El Pueblo; *Ángel De Jesús Matos,* abogado del querellado.

PER CURIAM: El Procurador General formuló querella contra el Juez de Distrito Sr. Agustín R. Hernández Enríquez. Los cargos pueden resumirse así:

Cargo 1. Que entre el 17 y el 21 de marzo de 1981 hizo uso de sus funciones y autoridad judicial para presionar al Sr. Jaime Rojas Puccini a pagarle $140 por daños ocasionados a un automóvil propiedad del querellado no obstante que el señor Rojas Puccini negaba ser el causante de dichos daños.

Cargo 2. Que el 6 de mayo de 1981, en funciones de juez,

impuso al Sr. Héctor Maldonado, como castigo por romper un boleto de tránsito y arrojarlo a la vía pública, recoger basura en la avenida Ponce de León en Santurce exhibiendo sobre su persona un rótulo que decía "Estoy recogiendo los papeles que tiré a la calle". El mismo cargo imputa que el querellado impuso igual castigo, el 21 de mayo de 1981, al Sr. José R. López Ávila por haber incurrido en conducta similar, cuyos castigos tuvieron un efecto humillante para dichos señores.

Cargo 3. Que intervino y tomó disposiciones reñidas con las normas administrativas del Tribunal de Distrito, Sala de Carolina, en relación con denuncias presentadas contra tres personas, demostrando un interés personal e inclinación para que dichos casos tuvieran un determinado y particular resultado.

Notificados los cargos al querellado y controvertidos por éste en su contestación, designamos un Comisionado Especial para recibir las pruebas de las partes. El Comisionado celebró audiencias en que recibió abundante prueba testifical y documental y finalmente rindió su informe, en que formuló las siguientes determinaciones de hecho con respecto a los tres cargos imputados:

A. DETERMINACION DE HECHO EN TORNO AL CARGO NUMERO UNO:

1. El día 17 de mayo de 1981 a eso de las 10:30 de la noche, el querellado, Sr. Agustín Hernández Enríquez, juez de distrito, visitó el Hipopótamo, un establecimiento comercial cercano al Centro Judicial de San Juan, en donde estaba, a la sazón, asignado a la Unidad de Investigaciones de dicho centro.

2. Al acudir a ese local comercial, estacionó su vehículo, un Volkswagen, modelo reciente, en lugar próximo en la Avenida Muñoz Rivera, donde ubicaba el establecimiento en cuestión, bloqueando una de las entradas al edificio contiguo, perteneciente al ciudadano Jaime Rojas Puccini y ubicado en el Núm. 878 de esa avenida.

3. Dicho ciudadano, Jaime Rojas Puccini, se personó al establecimiento mencionado y le pidió al querellado que

moviera su vehículo porque estaba obstaculizando una de las entradas a su edificio residencial.

4. El querellado no accedió a mover su vehículo, lamentándose de que no fuera posible tomarse en paz una taza de café y le indicó que llamara a la Policía, si quería. Sin embargo, unos quince minutos más tarde se retiró del lugar en su vehículo mencionado.

5. El ciudadano mencionado, Jaime Rojas Puccini, se retiró a su dormitorio en el mencionado edificio, pero a eso de la 1:30 a 2:00 de la madrugada sintió que tocaron el timbre de su residencia, escuchó pasos aproximándose a la puerta de entrada de su vivienda y vió a cuatro policías y un civil cerca de esa entrada, "allá abajo". La persona vestida de civil le comunicó que "el juez lo quiere ver" y "que no sabía para qué el juez lo quería" y que "se tiene que venir con nosotros". Pidió tiempo para prepararse y llamar a su abogado y se lo concedieron. Los hizo esperar bastante y cuando estuvo listo no le permitieron usar su propio vehículo; fue obligado así a acompañar este séquito en el carro oficial de patrulla policiaca en que se habían transportado hasta allí estos agentes.

6. La persona vestida de civil que le anunció en dicho lugar, a dicha hora el 18 de mayo de 1981 al ciudadano Jaime Rojas Puccini, que el juez lo quería ver y que tenía que acompañarlos en el auto de patrulla, fue el alguacil auxiliar, Carlos Lastra quien estaba en servicio en la referida Sal[a] de Investigaciones y quien actuó obedeciendo instrucciones específicas del querellado. Esta misión se llevó a cabo sin mediar orden alguna, escrita, de citación o de arresto, y fue auxiliado el referido alguacil por varios policías, no identificados individualmente por la prueba.

7. Una vez llegó este séquito con el ciudadano Jaime Rojas Puccini al Centro Judicial de San Juan, éste fue conducido al "parking", le mostraron el vehículo Volkswagen del Juez Agustín Hernández, que el referido ciudadano reconoció haber sido el mismo vehículo que esa noche había sido estacionado frente a su edificio bajo las circunstancias expresadas. Al mismo tiempo que le imputaron haber producido una larga raya en la pintura lateral del auto, la cual algunos testigos han atestiguado que corría a todo lo largo del vehículo en uno de sus costados y que mostraba señales de haber sido producida por objeto duro y, recientemente, ya que habían partículas de pintura fresca en ella.

8. Cuando subieron nuevamente a la Sala de Investigaciones, allí se topó con el Juez Agustín Hernández a quien poco antes se lo había identificado el Lic. Adalberto Torres Dosal, conocido suyo, con quien se encontró en el lugar. El Juez le imputó que le había "guayado" su carro con un[a] cuchilla.

9. Recabó la ayuda del mencionado Lic. Adalberto Torres Dosal. Este abogado habló con el Juez, escuchó la querella que él tenía contra este ciudadano, y fue a inspeccionar el vehículo rayado en el "parking". Más tarde el Juez "bajó del estrado" y se dirigió a Rojas Puccini indagando si le iba a pagar los daños, que si no se veía obligado a someter el caso ante otro juez. El ciudadano insistió en que "el no había sido" pero que "el prefería pagar los daños". El Juez encargó entonces a ese abogado de preparar el documento donde se obligaba, Rojas Puccini, a pagar los daños. Ese abogado preparó el documento fechado el 18 de mayo de 1981, que figura como Exhibit 5 del Procurador General, en donde Jaime Rojas Puccini "se compromete", a "pagar los daños ocasionados al automóvil Volkswagen 1980, 86U188, propiedad del Sr. Agustín Hernández el 17 de mayo de 1981, frente a mi casa, rayazo lado derecho de alante hacia atrás". Figuran allí como testigos, Carlos Lastra, Alguacil Aux. II, Placa 451 y Adalberto Torres Dosal.

10. Una vez preparado el documento, Rojas Puccini no procedió a firmarlo en seguida, vaciló un tiempo, pero finalmente puso su firma en el documento expresando que iba a firmar porque si no lo hacía "me va a costar lo mismo".

11. Luego de la firma del documento Rojas Puccini, divulgó sus teléfonos para que lo llamaran tan pronto se supiera a cuanto ascendían los daños que se había obligado a pagar, y se le permitió retirarse.

12. Para el día 21 de mayo de 1981 por la mañana, el Sr. Rojas Puccini recibió instrucciones directamente del Alguacil Carlos Lastra para comparecer a la Sala de Investigaciones durante la noche de ese día, a las ocho y treinta, para someter el caso. Fue informado además de que el estimado de los daños que se había comprometido a pagar ascendía a $140.00, la cual no había satisfecho.

13. El Sr. Jaime Rojas Puccini fue nuevamente la noche del 21 de mayo de 1981 a las ocho y media a la Sala de Investigaciones en donde estaban en funciones el juez querellado, el Alguacil Carlos Lastra y la Hon. Juez Municipal Silvia

Ricard. Esta vez el Sr. Rojas Puccini estuvo allí asistido del Lic. Federico Albándoz.

14. Se encontraba también esa noche en dicha Sala de Investigaciones, el Policía, Ernesto Torres Pérez, Placa #9590. El Juez Agustín Hernández Enríquez, solicitó y obtuvo la cooperación de este agente del orden público quien, a base de la información que le suministró el propio juez, preparó, juró y radicó denuncia "por daños" contra Jaime Rojas Puccini, imputándole haber rayado el vehículo Volkswagen del querellado el 17 de mayo de 1981 en la "Avenida Muñoz Rivera frente al #878". Señaló como testigos de los hechos en esa denuncia al Sr. Agustín Hernández y al alguacil Carlos Lastra, quien en la vista ante este Comisionado, testificó que sólo podía declarar en cuanto a que observó un rayazo de hechura reciente mostrado por el juez al testigo en inspección del auto en el "parking" del Centro Judicial de San Juan, la noche del 17 de mayo de 1981. (Véase Exhibit 6 del Procurador General.)

15. El Lic. Federico Albándoz, asistiendo profesionalmente al ciudadano Rojas Puccini ese día 21 de mayo de 1981 en la Sala de Investigaciones en cuestión, hizo un acercamiento en la oficina de los alguaciles al Juez Agustín Hernández Enríquez, con respecto a la imputación a que se enfrentaba su cliente. El juez estuvo dispuesto a retirar su querella si se le pagaban los daños y si Rojas Puccini retiraba una querella que contra él había radicado ante la Administración de Tribunales.

16. El Lic. Federico Albándoz recomendó a su cliente que aceptara pagar dichos daños y se librara de tener que someterse a un proceso judicial. El Sr. Rojas, sin embargo, no obstante lo acontecido el día 18 de mayo anterior cuando firmó un documento aceptando pagar dichos daños (Exhibit 5 del Procurador General), se resistía a aceptar tal arreglo propuesto, aduciendo persistentemente que no había producido el "rayazo" que se le imputaba.

17. Ante esta situación, el Juez Hernández Enríquez, el Alguacil Carlos Lastra, el Lic. Federico Albándoz y el Sr. Rojas Puccini acudieron donde la Hon. Juez Silvia Ricard, de turno, a someter el caso. No hubo ante dicha Juez proceso investigativo alguno. El Juez Hernández habló con ella, quería someterle el caso para determinación de causa probable. La Juez, en forma categórica, no accedió, señalando como

razones para su determinación, que "conocía los hechos", que no podía ser imparcial, que el perjudicado era amigo personal y compañero de trabajo. La Hon. Juez Gloria M. Lagrossi Brenes a quien ella sustituía esa noche en la susodicha Sala de Investigaciones, le había advertido que tratarían de someterle una querella en donde el perjudicado era el Juez Hernández Enríquez y le aconsejó que no interviniera, que la pasara para otro día o para el Centro Judicial de Carolina.

18. No obstante las reiteradas peticiones del Lic. Albándoz para que interviniera en la determinación de causa probable la Juez Ricard se mantuvo firmemente en su decisión de inhibirse o abstenerse de entrar en la vista de la querella y se llevaron las formas para trasladar el caso a otro juez. El Juez Hernández Enríquez le pidió a ella que le citara el caso para el otro día, y después le hizo la misma petición al alguacil.

19. Ante las recomendaciones insistentes de su abogado, el Sr. Rojas Puccini, después de dos negativas decidió hacer un cheque por la suma de $140.00 para indemnizar al Juez Hernández Enríquez por el susodicho daño a su vehículo. El cheque en cuestión es el Exhibit 7 del Procurador General (Cheque #429, fechado el 20 de mayo de 1981, girado por $140.00 por Jaime Rojas Puccini, Ave. Muñoz Rivera 878 Hyde Park, Río Piedras, Puerto Rico contra el Banco de San Juan, Río Piedras, Puerto Rico, a la orden de Hon. Agustín Hernández, con sello indicativo de que fue pagado por dicho banco en mayo 28 de 1981). El Sr. Rojas Puccini escribió en el dorso del cheque antes de entregarlo, la siguiente nota: "Hago este cheque por la siguiente razón, no he cometido los daños pero para evitar problemas de tribunal lo pago." Y firma la nota, Jaime Rojas. Este cheque fue entregado a la Juez Ricard quien lo pasó al Juez Hernández Enríquez. Entonces el Sr. Rojas pidió que se le devolviera el documento que había firmado el 18 de mayo de 1981 aceptando pagar los daños en cuestión. El Juez Hernández Enríquez entregó el documento a la Juez Ricard para que se lo entregara a éste, Sr. Rojas, una vez hubiera cumplido con la promesa de retirar la querella que contra él había radicado en la Administración de Tribunales. Esta condición o promesa de retirar tal querella no fue ejecutada o cumplida jamás por Rojas Puccini.

20. En la denuncia por el delito de daños, que suscribió el Policía Ernesto Torres, Placa 9560, contra Jaime Rojas Puccini, en el Apartado 2, sobre Determinación del Magistrado,

figura marcado el encasillado, "No hubo causa probable". Y figura anotado en manuscrito con la firma de Silvia Ricard lo siguiente: "La parte imputada determinó pagar los daños. Pagó la cantidad de $140.00, fecha 5/21/81."

21. El querellado, Juez Agustín Hernández Enríquez, en comunicación del 4 de septiembre de 1981 dirigida al Sr. Federico Díaz Ortiz, Asesor Legal de la Oficina de Asuntos Legales de la Administración de Tribunales (Exhibit 1 del querellado y 31 del Procurador General), contestando carta del Sr. Díaz Ortiz fechada el 29 de junio de 1981, con respecto a querella del "señor Rojas" se querelló de la Juez Silvia Ricard aduciendo que violó los cánones de ética judicial por lo expresado en declaración del Sr. Rojas. No está en evidencia declaración jurada alguna del Sr. Rojas. El prestó testimonio en el caso, sin embargo, y expresó que la Juez Silvia Ricard le manifestó cuando trataba de someter su caso ante consideración, "no se preocupe que hay un Dios". La Juez Ricard negó haber hecho tal manifestación. Concluimos por deducción que esta es la expresión a que se refirió el querellado. En esa comunicación (Exhibit 31 del Procurador General), el querellado manifestó "solicito se haga una investigación de la Juez Silvia Ricard" en cuanto a estos hechos y otras ocasiones en donde ella intervino en decisiones de este Ju[e]z cuando actuaba en la Sala de Investigaciones, Sala de San Juan". Más tarde se le pidió al querellado que sustanciara con particulares esta querella contra la Juez Ricard a lo que jamás respondió. (Exhibit 33 del Procurador General.)

## B. DETERMINACION DE HECHO CON RESPECTO AL CARGO DOS:

1. El 8 de mayo de 1981 el Policía Edgar Muriel Castro denunció a Héctor Maldonado Polanco por haber estacionado un vehículo en la vía pública, en violación de la ley. Cuando le entregó el boleto que constituía la denuncia, Maldonado Polanco rompió el boleto en pedazos y los lanzó a la calle. Entonces el policía lo arrestó y lo llevó a la Sala de Investigaciones del Centro Judicial de San Juan, ante el Juez Agustín Hernández. El arrestado aceptó haber incurrido en los hechos ya especificados. El Juez le indicó entonces que escogiera entre una multa o acceder a "recoger basura". Al decidirse por lo segundo, ordenó que se le pusiese un rótulo fijado al torso mientras estuviese "limpiando la calle" de basura en la vía pública por espacio de dos horas, el día siguiente.

2. Ese día 8 de mayo de 1981 en el Caso del Pueblo de Puerto Rico vs. Héctor Maldonado Polanco, Criminal Núm. INT 81-686 de la Sala de Investigaciones de San Juan, por una alegada violación de la Sec. 5-1117, de la Ley Núm. 141 del 20 de julio de 1960, según enmendada, Ley de Vehículos y Tránsito de Puerto Rico, el juez de distrito Agustín Hernández dictó sentencia (Exhibit 9 del Procurador General) contra el acusado. En dicha sentencia se hizo constar que el acusado hizo alegación de culpabilidad, sin estar asistido de abogado alguno y que fue condenado a la pena de "2 horas de trabajo limpiando la calle".

3. Surge del Exhibit 10 de Procurador General que el periódico El Vocero en su edición del jueves 14 de mayo de 1981 publicó dos fotografías de este ciudadano, indicándose que estaba recogiendo los papeles regados en la Calle del Sector de la Parada 23, cumpliendo una orden del Juez Agustín Hernández, impuesta como castigo por haber lanzado a la calle los pedazos del boleto entregado a él por un agente. En una de estas fotografías tomada de frente al referido ciudadano aparece, ceñido a su torso, un letrero en letras de gran tamaño con la siguiente expresión: "Estoy Recogiendo Papeles que Tiré en la Calle". Concluimos que este reportaje gráfico y escrito refleja correctamente la forma y manera en que se cumplió la sentencia dictada y la publicidad que se le dió al asunto.

4. En comunicación (Exhibit 12 del querellado) fechada el 21 de septiembre de 1981 y dirigida al Sr. Federico Díaz Ortiz, Asesor Legal, Oficina de Asuntos Legales, Administración de Tribunales, el Juez Agustín R. Hernández, el querellado, expresó lo siguiente: "En relación a la querella presentada por el Sr. Héctor Radamés Maldonado Polanco, la cual recibí copia en el día de hoy, el único comentario que tengo es que este señor se equivocó en la alternativa que se le dió, la cual fue de recoger la basura y se le quitaría una denuncia por violación a la Ley. La manifestación que él hace de que la alternativa era de enviarlo siete (7) días a la cárcel Regional de Bayamón, no es cierta."[1]

---

[1] "La Representante del Procurador General trató de presentar en evidencia una declaración jurada del Sr. Héctor Maldonado. Ante la objeción de la representación legal del querellado, [e]ste Comisionado denegó la admisión por no haberse cumplido con los requisitos de la Regla 64 de Evidencia y se dispuso que quedara en el expediente como evidencia ofrecida y no admitida, conforme a lo dispuesto en la Regla 13 del Reglamento del Tribunal Supremo."

5. El día 21 de mayo de 1981 el Policía Joaquín Hernández, Placa #10447, adscrito al cuartel de Barrio Obrero en Santurce, arrestó y denunció al ciudadano José R. López Avila imputándole haber lanzado en pedazos a la vía de rodaje de la Ave. Borinquen, Esq. Morell Campos en Barrio Obrero, en Santurce, un boleto de falta administrativa.

6. Fue llevado este ciudadano para determinación de causa probable ante la presencia del Juez Agustín Hernández Enríquez, el querellado, de la Sala de Investigaciones del Centro Judicial de San Juan, ante quien hizo alegación de culpable. Entonces este juez le preguntó qué prefería "recoger basura o ir a la cárcel". Al decidirse por lo primero, le ordenó preparar un letrero grande con la inscripción: "Estoy Recogiendo Basura Que Tiré a la Calle" y presentarse al otro día donde los policías testigos de cargo lo llevarían a ejecutar tal castigo en la zona de Hato Rey.

7. Ese mismo día regresó el ciudadano José R. López por la tarde a la Sala de Investigaciones del mencionado Centro, "a buscar orientación". Lo pasaron a la Sala de la Hon. Juez Gloria Lagrossi, quien le informó que no lo podía ayudar porque no tenía la denuncia pero lo instruyó para que volviera al día siguiente. Deducimos que en este momento esta Hon. Juez Gloria Lagrossi hizo la orden, sin fecha, en manuscrito, que figura como Exhibit 10 del querellado y que transcrita literalmente dice así:

### ORDEN

Se cita al Hon. Juez Agustín R. Hernández y al Sr. José R. López Avila, para las 2:00 de la tarde, antes de que se ejecute la sentencia dictada en este caso según alega el Sr. José R. López Avila.

(fdo. Gloria Lagrossi Brenes)

Pol 7-1044 Tnte. Manuel Llanos
que el Juez se quedó con el expediente.

8. El día siguiente, 22 de mayo de 1981, por la mañana, José R. López volvió al Centro Judicial de San Juan. No pudo entrevistarse con la Juez Lagrossi pero consiguió cita con el Hon. Juez Rurico Rivera Rivera, a quien le expresó su problema, consistente en el castigo que debía cumplir. Después de haberse comunicado con el Juez Rivera Rivera, al poco rato, le avisaron que se presentara a la sala del Hon. Juez Agustín Hernández Enríquez. Cuando se presentó ante el querellado,

éste le expresó: "Caramba, yo no esperaba encontrarlo en esta forma, sí, ya sé que usted estuvo asesorándose." El juez procedió a dictar o suscribir Orden de Arresto (Exhibit 14 del Procurador General) en donde se fijó fianza de "$1,000.00 ó $100.00 en efectivo", que el acusado prestó ($100.—en efectivo) (Exhibit 15 del Procurador General). Se le notificó Citación (en forma impresa) allí, entonces, fijando fecha del juicio de su caso para el 10 de junio de 1981 a las 8:30 A.M. (Exhibit 13 del Procurador General).

9. El 25 de mayo de 1981 este acusado, José R. López, volvió a visitar la mencionada Sala de Investigaciones a ver si se veía su caso y porque quería declararse culpable y desprenderse de la nerviosidad que lo embargaba. La alegación de culpabilidad la hizo ese día ante la Hon. Juez Silvia Ricard, quien la aceptó luego de hechas las advertencias legales y lo sentenció a pagar multa de $15.00 más las costas ($1.50), (Exhibit 11 del Procurador General).

## C. DETERMINACION DE HECHO RESPECTO AL CARGO NUMERO TRES:

1. El día 10 de agosto de 1981 el Sr. Agustín R. Hernández Enríquez, actuando a la sazón como juez asignado temporeramente (asignación por el término comprendido entre el 3 al 19 de agosto de 1981 —Exhibit I del querellado) en la Sala de Carolina del Tribunal de Distrito de Puerto Rico, determinó causa probable en el caso criminal 81-1287 del Pueblo vs. Esther Figueroa, figurando como perjudicadas Sonia y Carmen Betancourt, acusadas por el mismo delito cometido contra dicha Esther Figueroa en otros casos criminales 81-1285 y 81-1287 de esa sala, y dictó, sin consulta previa con el Juez Administrador, Hon. Rafael Orraca, orden de arresto contra la acusada, con $3,000 de fianza o $300 en efectivo, para ser diligenciada por la Policía de Puerto Rico (Exhibit 19 del Procurador General). Esta orden de arresto contiene la siguiente nota: Favor No Rebajar Fianza A Menos Que Sea Juez Superior — Si se arresta, cítese para el día 14 de agosto de 1981, a las 8:30 A.M., Sala 3. Esta orden de arresto, no obstante estar dirigida a la Policía, fue diligenciada por el Alguacil Auxiliar II, José Morales. Las acusaciones fueron por una violación del Artículo 260 del Código Penal (alteración de la paz) y señaló, dicho juez, el juicio del caso para el próximo 14 de agosto de 1981, a las 8:30 A.M. en la Sala III, a su cargo, en dicho Tri-

bunal (dentro del término de su asignación a ese Tribunal) (Ver Exhibits 18, 20 y 23 del Procurador General).

2. Ese día estaba en funciones en dicha Sala como Juez Instructor a cargo de la Sala de Investigaciones el Hon. José L. Hidalgo. Los funcionarios de este Tribunal, en ocasiones en que el Juez Instructor no estaba momentáneamente disponible referían casos pendientes de determinación de causa probable a otros jueces del Tribunal, por lo general, mediante consulta con el Juez Administrador. En esta ocasión no surge que se hiciera esa consulta; tampoco surgen más particulares de cómo vino este caso a la atención del Juez Agustín Hernández.

3. En la misma fecha, 10 de agosto de 1981, otro juez de ese Tribunal determinó causa probale en los dichos casos criminales 81-1785 y 81-1786, Pueblo vs. Sonia y Carmen Betancourt (Exhibit 16 del Procurador General), por la misma violación que se imputó a la acusada, Esther Figueroa en el caso 81-1287, figurando ahora como perjudicada (Exhibit 16 del Procurador General). Este otro juez[2] señaló el juicio de ese caso para el 3 de septiembre de 1981, en la Sala III de ese Tribunal (Exhibit 19 del Procurador General).

4. El mismo día 10 de agosto de 1981, el Sr. Agustín Hernández, actuando como juez del referido Tribunal cambió el señalamiento previo de ese otro juez en los referidos casos contra Sonia y Carmen Betancourt, de la fecha 3 de septiembre de 1981, para el 14 de agosto de 1981, en la Sala III. Este lo efectuó sin consulta con el Juez Administrador (Exhibits 17, 21, 22 del Procurador General).

5. El día 14 de agosto de 1981 el Juez Administrador de la Sala de Carolina del Tribunal de Distrito, Hon. Rafael Orraca, se percató de que el Juez de la Sala III, el querellado, habría de intervenir en un caso del que ya tenía conocimiento previo por haber sido el juez instructor en el mismo, cuatro días antes. Se entrevistó con dicho Juez y le señaló que no debía intervenir por la circunstancia mencionada y porque tenía mente prevenida. Además, le indicó que el señalamiento para juicio cuatro días más tarde violaba la norma de que el juicio aconteciera después de un período de 20 días para dar oportunidad a una debida preparación. El Sr. Agustín Hernández le comunicó que iba a ver los casos y que haría un informe a

---

[2] "No hemos podido descifrar las iniciales de este otro juez que aparecen en dicho Exhibit."

Administración de Tribunales a lo que, respondió el Juez Administrador, que él también lo haría; y le ordenó no intervenir en los casos. El Juez Administrador también dió instrucciones al Alguacil Luis Antonio Luciano que se notificara a las partes que estaba suspendida la vista porque habían muchos casos. (³)

6. No obstante lo sucedido, los casos ya relacionados (se trataba de una denuncia y una contradenuncia) fueron llamados para juicio el día 14 de agosto de 1981 en la Sala III del referido Tribunal, presidida por el querellado, quien manifestó inmediatamente que "él no intervendría en el Caso Criminal 81-1287 del Pueblo vs. Esther Figueroa, porque éste es un caso en que yo mismo fui el que ví la causa probable", y dispuso "yo no puedo ver este caso, hay que trasladarlo a otro sitio". También consignó para "récord" "porque a mí se me ha pedido de que yo no vea este caso en el día de hoy precisamente como a mí, yo soy Juez [sic] de esta sala y creo que este caso es de interés público". Entonces leyó parte del contenido del Exhibit 26 del Procurador General (Circular de la Oficina de Administración de los Tribunales, Año Fiscal 1981–82 sobre Normas y Procedimientos para la Solicitud y Concesión de Relevo de Jueces). (Este documento se refiere al análisis de casos civiles que llevan más de un año de haber sido sometidos, a los fines de decidir sobre el relevo de un juez de sala para resolver tales casos sometidos.) Se desprende que este documento fue citado para fundamentar la decisión de este Juez de proseguir con la vista de los casos ante él, al considerarlos de "interés público", ya que estos casos, según su criterio, habían recibido publicidad en los periódicos y eran de "impacto público" donde existía una expectativa de la comunidad de que fueran resueltos prontamente por afectar derechos, "más allá de las partes en controversia". Añadió en esa ocasión el querellado, en corte abierta: "A mí se me ha pedido que suspenda este caso. Y voluntariamente no lo quiero suspender y por eso es que vamos a récord, porque yo voy a informar eso al Tribunal Supremo y voy a informarlo a la Administración de Tribunales. ¿Por qué si este es un caso de estos que ellos mismos explican aquí y que uno lo que está tratando precisamente es de que se arreglen las cosas, por qué

---

(³) "Aparentemente no se cumplió con estas instrucciones del Juez Administrador y no surge el porqué."

entonces se me pide y se me ordena eso, de que transfiera este caso para esta vista. Por eso es que yo voy a recesar los diez (10) minutos y voy a dejar que los abogados hablen conmigo y hablen con quien tengan que hablar. Todavía no he resuelto si voy a ver el caso o no." (Exhibit 25 del Procurador General —Transcripción de los incidentes en la referida Sala III el día 14 de agosto de 1981). Debe señalarse que la representación legal de la acusada, Esther Figueroa, Lic. Santiago Guzmán Esquilín, tratándose, según los abogados de las partes, de un derecho renunciable, el relacionado con la intervención del juez que ha determinado causa probable antes, no sólo no tuvo objeción a que el Juez Agustín Hernández interviniera en el caso aunque hubiera sido el juez instructor en el mismo, sino que insistió fuertemente en que se decidiera a intervenir en éste (Exhibit 25 del Procurador General — Página 7, líneas 19, 20, 21, 22, 23).

7. Después de una conferencia entre las partes con los abogados y el Hon. Angel Del Valle,(4) representante del Ministerio Público, regresaron a sala para hacer conjuntamente, expresiones decididas y categóricas en favor del archivo ("en bien de la justicia") de los casos, bajo las disposiciones de la Regla 247 de Procedimiento Criminal, (porque "estas dos denuncias o pliegos acusatorios surgen de la misma transacción o evento" y porque habían llegado a la conclusión "llegando al fondo de este mismo problema que no hay tal problema, que aquí lo que ha habido es una mala interpretación en un roce liviano de los que una convivencia normal a veces produce y hemos llegado más lejos a concluir que aquí no ha pasado nada". (Exhibit 25 del Procurador General —Página 10.) Además se suplicó al Tribunal que "en ejercicio de una sana discreción se archivaran estos casos donde por la razón última de aquí realmente nada que valga la pena sustanciar en un Tribunal [sic] de justicia . . .". El representante del Ministerio Público se dirigió al magistrado expresando que se había entrevistado personalmente con las personas acusadas y que habían promovido las denuncias y contradenuncias y que éstas indicaban que "aparentemente hubo un mal entendido",

---

(4) "La transcripción de la vista del 14 de agosto de 1981 (Exhibit 25 del Procurador General) indica el nombre del fiscal que actuó en ese momento como Hon. Angel Luis Díaz. Sin embargo, en la vista ante este comisionado declaró bajo juramento haber sido el fiscal actuando en esa ocasión, el Hon. Angel Díaz Del Valle."

que no tenían interés en que se prosiguiera con los casos, que pedían "que se resolviera todo sin ninguna consecuencia futura". Al final de estas expresiones, el Hon. Fiscal manifestó no tener ningún reparo para que estos casos se archivaran "por el bien de la justicia, bajo la Regla 247(b)".

8. El juez Agustín Hernández entonces determinó el archivo y sobreseimiento de los referidos casos criminales, por la Regla 247(b) de Procedimiento Criminal, según solicitado por las partes (Exhibit 25 del Procurador General —Transcripción Página 14; Exhibits 16 y 18 del Procurador General).

Hemos examinado la voluminosa transcripción de los testimonios orales producidos ante el Comisionado, así como los numerosos documentos presentados y concluimos que las determinaciones de hecho que hemos transcrito se ajustan a dicha prueba. No obstante, para una más justa apreciación de los hechos, cabe hacer algunos señalamientos adicionales que tomamos de las determinaciones finales del Comisionado [5] y de la transcripción de la prueba oral.

Vamos a referirnos, en primer lugar, al primer cargo. La prueba del querellado no controvierte las bien fundadas determinaciones del Comisionado Especial. Aparte de ofrecer abundantes testimonios sobre la buena reputación del querellado, de lo que nos ocuparemos más adelante, su prueba pertinente a los hechos de este cargo en particular fue dirigida a demostrar que el señor Rojas Puccini no es persona ajena a los procedimientos judiciales, que en ocasiones se ha tomado la justicia por sus propias manos, y que en una ocasión trató de engañar al tribunal en el curso de una investigación al tratar de ocultar su identidad al juez investigador. [6]

_____

[5] Determinaciones respecto al historial y reputación del querellado.

[6] Mediante el contrainterrogatorio al señor Rojas Puccini y otra prueba presentada se demostró que en una ocasión, sin que mediara autorización judicial, este señor puso candados y clausuró la entrada al dormitorio de los inquilinos suyos, jóvenes estudiantes universitarias, impidiéndoles la entrada a su regreso de estudiar en la biblioteca, en horas de la noche. Alegó que las jóvenes lo habían querido asaltar y un juez tuvo que intervenir y ordenarle que permitiera a las estudiantes

El propósito de esta prueba parece ser demostrar que hubo destemplanza en la actitud de este señor cuando conminó al querellado a mover su automóvil del lugar en que estaba aparcado, y que efectivamente fue este señor el que causó el rayazo al vehículo. Esta prueba puede explicar la conducta del querellado pero no la justifica.

Conocemos la fragilidad de la condición humana, propensa a hallar cauce para la ira en el lenguaje altisonante o soez o en la acción directa y dañosa. Quizás así reaccionó el señor Rojas Puccini ante la desatención del querellado a su reclamo de que moviera su automóvil y el querellado a su vez no supo apartarse de su condición de juez ante lo que consideró un daño intencional a su propiedad por parte del señor Rojas Puccini.

La fragilidad humana no puede justificar que un juez entremezcle sus problemas e intereses personales con sus funciones judiciales y que aproveche la autoridad y las prerrogativas de su cargo para sacar ventajas en una controversia en que es parte interesada. Y eso fue lo que hizo el querellado señor Hernández Enríquez. Para ello se sirvió de un alguacil adscrito a su sala de investigaciones, no separó las funciones de su cargo del problema personal en que era parte, y utilizó o pretendió utilizar su posición de juez para presionar, obtener y cobrar una indemnización que siempre protestó el señor Rojas Puccini. Tal conducta está proscrita por los Cánones I, XII, XXI, XXIII y XXIV(g) de Ética Judicial y exige nuestra más enérgica repulsa y debe merecer una adecuada sanción disciplinaria.

Los hechos probados en relación con el segundo cargo revelan que el querellado se excedió al imponer a los señores

entrar a sus habitaciones. En otra ocasión el juez Hon. José A. Rodríguez Arenas, de la Sala de Investigaciones, tuvo que amonestarle por fingir ser otra persona —un hermano gemelo— al ser llamado por teléfono para que compareciera en relación con una queja de que quiso retener para sí el depósito en dinero que le habían hecho tres jóvenes inquilinas suyas.

imputados penalidades que no cuadran con nuestro sistema de impartir justicia.

◼ El trabajo como sanción disciplinaria está aceptado expresamente en nuestro Código Penal, pero bajo condiciones que son de estricto cumplimiento. Entre éstas, el trabajo ha de ser en sustitución de una multa, "a solicitud del multado, después de dictada sentencia imponiendo el pago de multa".(7) La alternativa que el querellado, ofreció a los imputados, sin ellos solicitarlo, de aceptar recoger basura o pagar una multa no impuesta o ir a la cárcel no está aceptada por nuestro ordenamiento penal. No tenía facultad el querellado para así hacerlo.

◼ La sanción impuesta fue aún más lejos. Requerir de los imputados que mientras recogían basura en la vía pública, bajo supervisión de un policía, lucieran sobre su persona "un letrero en letras de gran tamaño", como lo describe el Comisionado, con la expresión "Estoy Recogiendo Papeles que Tiré en la Calle", sometía a los imputados a la mofa, el escarnio y la humillación. Esto podría estar en conflicto con la prohibición constitucional contra castigos crueles e inusitados(8) y vulnera el principio de inviolabilidad de

---

(7) El Art. 47 del Código Penal, 33 L.P.R.A. sec. 3209, dispone:

"*Sec. 3209. Amortización de multa mediante prestación de trabajo*

El tribunal, a solicitud del multado, después de dictada sentencia imponiendo el pago de multa, discrecionalmente, podrá autorizar el pago o amortización de la multa o de la parte insoluta de la misma mediante la prestación por el convicto de trabajo libre bajo la supervisión y jurisdicción de sistema correccional del Estado Libre Asociado de Puerto Rico. Se abonarán $10.00 por día de trabajo, cuya jornada no excederá de 8 horas diarias.

La Administración de Corrección y la Administración de los Tribunales deberán aprobar la reglamentación pertinente para poner en ejecución las disposiciones de la presente sección, entre otras, en cuanto a normas, condiciones y lugares de trabajo y supervisión. Dicha reglamentación tomará en cuenta la rutina normal de trabajo del convicto.

El tribunal conservará jurisdicción sobre el convicto a los fines del cumplimiento de la orden de amortización así dictada, incluyendo, en los casos apropiados, la facultad de dejar sin efecto dicha orden, exigir el pago total de la multa, o en su caso, el balance insoluto de la misma."

(8) Constitución, Art. II, Sec. 12.

la dignidad del ser humano.(9) La picota pública hace tiempo que fue erradicada como castigo y es extraña a nuestra civilización.

■ En cuanto al tercer cargo, la prueba demostró un particular interés del querellado en intervenir en el caso de las tres señoras que se hallaban involucradas en un conflicto personal entre sí. Ese interés inusitado quedó demostrado por su insistencia en señalar el juicio de las tres imputadas en un plazo de cuatro días, para el 14 de agosto, restándole a él hasta el 19 de ese mes para cesar en su asignación a la Sala de Carolina, e insistir además, por sobre la advertencia del juez administrador de dicha sala, en intervenir en el juicio no obstante haber determinado causa probable contra una de las imputadas. La conducta y expresiones del querellado demuestran además su menosprecio por las reglas administrativas de la sala en que actuaba, aparte de constituir motivo de fricción con otros compañeros jueces.

El querellado enfatiza que logró con ello el propósito de establecer la armonía entre las imputadas. Ese es un propósito legítimo, pero su logro no debe realizarse a expensas de la imagen de imparcialidad y objetividad que un juez debe aparentar siempre. Tampoco era necesario violentar la disciplina administrativa de la sala en que actuaba. Estas actuaciones del querellado violaron los Cánones I, V, XI y XII de Ética Judicial.

■ Las actuaciones del querellado, en cuanto se refiere al cargo segundo y en parte al cargo tercero pueden catalogarse de actuaciones judiciales revisables en el curso ordinario de los procedimientos. La imposición de una pena desproporcionada a los hechos delictuosos o reñida con la ley o la Constitución no necesariamente constituye conducta antiética. Tampoco lo constituye, necesariamente, la intervención del juez en un juicio contra una persona si dicho juez hubiese determinado causa probable contra dicha persona.

---

(9) Constitución, Art. II, Secs. 1 y 8.

Esto es también revisable mediante procedimientos al alcance de las partes. Lo reprobable desde el punto de vista de la ética judicial lo constituye, en este caso, el indebido uso del querellado de sus prerrogativas de juez para tomar ventaja en su controversia con el señor Rojas Puccini, objeto del primer cargo; y en cuanto al tercer cargo, su falta de objetividad, dando la apariencia de favorecer a alguna de las partes, en el caso de las imputadas de alterar la paz; y su falta de disciplina en relación con las normas administrativas del Tribunal de Distrito, Sala de Carolina.

Estas faltas, particularmente en lo relacionado con el primer cargo, son de naturaleza grave. Revelan una destemplanza en el carácter del querellado impermisible en quien descarga la delicada función de impartir justicia.

El querellado produjo ante el Comisionado Especial numerosos testimonios sobre su buena reputación como juez trabajador, responsable y eficiente, virtudes que son deseables en todo juez. Pero la objetividad y la moderación son virtudes indispensables no solamente para ser un buen juez sino también para parecerlo. Puestas a prueba en los incidentes objeto de estos cargos, fueron superadas por la falta de sensatez.

*Se decretará la destitución del querellado del cargo que ocupa de Juez de Distrito.*

El Juez Presidente Señor Trías Monge se inhibió y el Juez Asociado Señor Rebollo López no intervino.